## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

AGNES KOLE,                                          :

                    Plaintiff,        :    Civil No. 3:03CV1027(WWE)

    v.                                             :

WARDEN KUMA DEBOO, et al.,                  :

               Defendants.    :    February 19, 2004

### MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANTS' MOTION TO DISMISS

The United States of America, on behalf of the defendants, has moved pursuant to

Fed.R.Civ.P. 12(b) to dismiss this suit in its entirety.  For all of the reasons that follow, the

defendants' motion to dismiss the complaint should be granted.

### I.    Standard for Review

Review of a motion to dismiss based on Fed.R.Civ.P. 12(b)(6) requires courts to "accept

as true the factual allegations of the complaint, and draw all inferences in favor of the pleader."

*Mills v.  Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *accord Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Thomas v. City of New York*, 143 F.3d 31, 37 (2d

Cir. 1998).  A Rule 12(b)(6) motion to dismiss should be granted only if it "appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)(quoting *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957)).  Nevertheless, "legal conclusions, deductions, or opinions couched as

factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La*

*Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y. 1988); *see also Leeds v. Meltz*, 85 F.3d

51, 53 (2d Cir. 1996)"[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice")(citations omitted).

## II.    Inmate Financial Responsibility Program[1]

In 1987, nearly seventeen years ago, the Bureau of Prisons (hereinafter "BOP") initiated a program known as the Inmate Financial Responsibility Program (hereinafter "IFRP") through which inmates are encouraged to meet their court-ordered financial obligations and to demonstrate responsible behavior which is then reflected in their custody classification score[2]. 28 C.F.R. § 545.10(2001).  Each inmate is encouraged to satisfy his/her legitimate court ordered obligations by developing a financial plan with the Unit Team[3].  28 C.F.R. § 524.11(a)  These plans are developed during an inmate's program review[4] which is held ordinarily every 180 days. 28 C.F.R. § 524.12(b).

To develop an inmate's financial plan, the Unit Team considers the amount of deposits in the inmate's commissary account over a six (6) month period of time, less $75.00 a month to maintain telephone communications and any prior payments to the IFRP.  28 C.F.R. § 545.11(b). The remaining balance is then considered for payment toward the court ordered obligations.  For

---

[1] *See* Exhibit 1, Inmate Financial Responsibility Program Statement.

[2] This score assists staff in determining the appropriate housing for an inmate.

[3] A Unit Team consists of the Unit Manager, Case Manager, and Correctional Counselor from the housing unit.  28 C.F.R. § 545.11(a).   Plaintiff named her Unit Manager, Merry Wilmer, and her Counselor, Mark Staiger as defendants.  Plaintiff makes no reference to her Case Manager, Deborah Cowan.

[4] Program Review is essentially a meeting with the Unit Team and other staff to review the inmate's apparent needs and offer a correctional program, such as the IFRP, to meet those needs.  28 C.F.R. § 524.20(d).

inmates who are employed by the Federal Prison Industries, known as "UNICOR", they are expected to contribute at least 50% of their monthly pay to their court ordered obligations. (28 C.F.R. § 545.11(b)(2)). Inmates contribute toward their court ordered obligations through deductions from their commissary account.

While an inmate is encouraged to meet their financial obligations, the inmate may refuse to participate in the IFRP.  28 C.F.R. § 524.12(d) & 28 C.F.R. § 545.10.  On the other hand, inmates who participate in the IFRP are allowed to earn more inmate performance pay.  For example, Ms. Kole is currently earning $1.30 per hour working in UNICOR.  If she should refuse to participate in the program, she would be reduced to 'maintenance' pay which is $5.25 a month.  28 C.F.R. § 545.11(d)(3).  In addition, those inmates who work in UNICOR must participate in the program or the inmate will be removed from the UNICOR work detail and assigned to work elsewhere. 28 C.F.R. § 545.11(d)(5).  Additionally, inmates who participate in IFRP have the privilege of spending up to $275.00 per month, excluding postage and telephone time, in the commissary[5].  An inmate who refuses to participate, however, is only allowed to spend $25.00 per month, excluding postage and telephone time, in the commissary. 28 C.F.R. § 545.11(d)(6).  In addition, inmates who participate in the IFRP at the Federal Correctional Institution in Danbury, Connecticut, (hereinafter "FCI Danbury"), are usually assigned to a two women cell, whereas inmates who refuse are usually assigned to a dormitory room, the lowest level of housing.  28 C.F.R. § 545.11(d)(7). (See Exhibit 2, Declaration of Deborah Cowan.)

---

[5]   Commissary provides inmates the privilege of obtaining merchandise either not provided by the Bureau of Prisons or a different quality than that provided by the Bureau. Commissary items include brand name toothpaste, deodorant, shaving cream, and various food items like candy bars or instant soup.  The necessary toiletries are provided free to the inmates.

### III.     Factual Background

The plaintiff, Agnes Kole, is currently serving a 240 month sentence of incarceration, followed by 10 years of supervised release for conviction of 21 U.S.C. § 963, knowingly conspiring to import heroin, imposed in District Court for the District of New Jersey in a case styled United States v. Agnes Kole, docket number 93-426. Ms. Kole was sentenced in New Jersey District Court on June 19, 1996. Ms. Kole was ordered as part of her sentence to pay a $50.00 special assessment and a $4,000.00 criminal fine. (*See* Exhibit 3, Judgment and Commitment Order). Ms. Kole is projected to be released from custody on February 10, 2011, subject to an Immigration and Naturalization Service (hereinafter "INS") detainer.

Ms. Kole has been incarcerated at FCI Danbury since August 7, 1996. (Exhibit 2, Paragraph 4). Through the IFRP, Ms. Kole completed payment on her special assessment by February 11, 1997. (Exhibit 2, Paragraph 4). From April 9, 1998 until March 14, 2002, Ms. Kole did not make any payment toward her court ordered fine. (Exhibit 2, Paragraph 4). Ms. Kole reported to FCI Danbury staff that she had made a motion to challenge the fine. (Exhibit 2, Paragraphs 4 and 5). On March 14, 2002, during her regular six (6) month program review, staff requested Ms. Kole to provide evidence that the challenge to her court ordered fine was still pending by her next program review, scheduled in September 2002.

Ms. Kole failed to produce the evidence as requested by the FCI Danbury staff at the next program review held on September 6, 2002. (Exhibit 2, Paragraph 6). Ms. Kole was advised by FCI Danbury staff during the September 6, 2002 program review that she needed to participate in the IFRP or she would be listed as refusing to participate. (Exhibit 2, Paragraph 6). Ms. Kole then agreed to participate in the IFRP.

In view of the fact that Ms. Kole had not contributed toward the IFRP since 1998, the Unit Team determined that she should make an initial lump sum payment toward her outstanding fine, and thereafter contribute 50% of her UNICOR wages in accordance with 28 C.F.R. § 545.11(b)(2).

The determination by the FCI Danbury staff that Ms. Kole should make an initial lump sum payment in the amount $700.00 (as opposed to some other amount), was based upon the following considerations. First, the Unit Team considered the total of all deposits made to Ms. Kole's commissary account during the previous six months. The calculation of all deposits included Ms. Kole's UNICOR pay and any money deposited from outside sources. 28 C.F.R. § 545.11(b). Over the six months prior to September 2002, Ms. Kole earned $732.81 from UNICOR. She also had $4,000.00 deposited into her commissary account from outside sources. Thus, during the previous six months, a total of $4,732.81 had been deposited into Ms. Kole's commissary account.[6]

Prior to determining an appropriate lump sum IFRP payment amount, however, the FCI Danbury staff first deducted from Ms. Kole's total deposits certain expenses, as follows. In

---

[6] When reviewing inmates' commissary accounts for purposes of determining IFRP contributions, FCI Danbury staff base their determinations on the total deposits to an account during a certain period of time (usually six months), as opposed to the current balance of the account on the day of the program review. FCI Danbury staff follow this practice because it was commonplace for inmates to deplete, or "spend down" their commissary accounts immediately before a program review in order to appear destitute and avoid IFRP contributions. Under current practice, even if a commissary account is depleted prior to a program review, FCI Danbury staff will still use the account's total deposits for the previous six months to determine an appropriate amount for contribution. If an inmate cannot pay the amount determined by FCI Danbury staff because the account is depleted, the inmate will nevertheless be declared in IFRP refusal status for their failure to pay the determined amount.

5

accordance with 28 C.F.R. § 545.11(b), FCI Danbury staff deducted $450.00 from the total

deposits (of $4,732.81), representing the allocated $75.00 per month cost for telephone calls.

Staff further deducted $2,000.00 from the total deposits, which was then set aside for Ms. Kole's

release savings plan.  Since Ms. Kole had not made a payment toward her fine in four (4) years,

no amount was deducted from total deposits representing prior IFRP payments.

Thus, when considering the amount of initial, lump sum contribution that Ms. Kole

should make based on the total of deposits to her account, FCI Danbury staff based their decision

on deposits totaling $2,282.81, rather than $4,732.81.  Moreover, while the Staff could have

recommended that Ms. Kole contribute an initial lump sum payment of any amount, up to

$2,282.81; the staff instead recommended a more modest lump sum payment of $700.00.

Further, when FCI Danbury staff made the recommendation during the September 6,

2002 program review that Ms. Kole should make an initial contribution of $700.00, the actual

balance of Ms. Kole's commissary account at the time was $1,793.31.  Thus, Ms. Kole did not

face being automatically declared in IFRP refusal status because of the unavailability of funds.

Ms. Kole agreed with the Staff's recommendation and provided written authorization on

September 10, 2002 for the $700.00 contribution.  (Exhibit 2-D to Declaration of Deborah

Cowan).

Once the initial lump sum IFRP contribution of $700.00 was deducted from Ms. Kole's

commissary account, she had remaining funds totaling $1,093.31, which she could spend in any

manner [7].

---

[7] A further review of Ms. Kole's commissary account shows that from August 7, 1996 to
January 30, 2004, Ms. Kole has earned a total of $ 4,515.32 through her performance pay; and

On September 17, 2002, Ms. Kole filed a Request for Administrative Remedy (Exhibit 4). The basis of Ms. Kole's Request was that the source of most of the funds in her commissary account, including the $700.00, was from an "outside source", as opposed to wages she earned while incarcerated. Ms. Kole contended that pursuant to the IFRP and her authorization, only wages earned while incarcerated could be used for payment of her criminal debts. Specifically, Ms. Kole stated in her Request that "[t]he Courts do not force a person to have personal funds taken out of their pay. I would like my money put back in my account".[8]

Ms. Kole further contended in her Request for Administrative Remedy that when she initially enrolled in the IFRP, she authorized the withdrawal from her commissary account of half of her wages, and that that payment arrangement should be reinstated.

Ms. Kole's Request for Administrative Remedy was denied by Warden Kuma Deboo on October 9, 2002. (Exhibit 5).

Ms. Kole filed a Regional Administrative Remedy Appeal on October 21, 2002. (Exhibit 6).

---

that an additional $20,906.89 has been deposited into her account from other sources. Thus, the total amount of deposits made to Ms. Kole's commissary account while incarcerated at FCI Danbury is $25,422.21. (Exhibit 2, paragraph 10)

[8] Ms. Kole's contention that funds from personal, "outside" sources are not available for satisfaction of criminal financial obligations is contrary to law and fact. The IFRP, at 28 C.F.R. § 545.11(b), states in relevant part that "[p]ayments may be made from institution resources or **non-institution (community) resources**." (Emphasis supplied). *See* also 18 U.S.C. § 3613(a) which provides that "a judgment imposing a criminal fine may be enforced against all [non-exempt] property . . ." of the debtor. Additionally, there is no restriction in Ms. Kole's September 10, 2002 authorization that the $700.00 withdrawal could only be deducted from wages.

Then, on October 25, 2002, Ms. Kole provided written authorization to make future payments toward the remaining balance of her fine by paying 50% of her UNICOR wages. (Exhibit 2-E to Declaration of Deborah Cowan).

Ms. Kole's Regional Administrative Remedy Appeal (dated October 21, 2002) was denied by BOP Regional Director Ray on November 21, 2002. (Exhibit 7).

Ms. Kole then filed a Central Office Administrative Remedy Appeal on December 16, 2002. (Exhibit 8).

Ms. Kole's Central Office Administrative Remedy Appeal was denied by National Inmate Appeals Administrator Harrell Watts on January 30, 2003. (Exhibit 9).

Ms. Kole then commenced this action on June 9, 2003.

As of February 19, 2004, Ms. Kole's remaining criminal fine balance is $1,217.58.[9][10]

## IV. The Complaint

### A. The Parties

Ms. Kole individually names Kuma J. Deboo, who is the Warden at FCI Danbury, as the only defendant in the caption of the case. Ms. Kole however, completed Section III. C of the Complaint, entitled "Parties" and "Additional Defendants", by identifying Merry R. Wilner, Unit Manager at FCI Danbury and Mark Staiger, Correctional Counselor at FCI Danbury as additional

---

[9] It is noted that in accordance with 42 U.S.C. § 10601, all of Ms. Kole's special assessment and fine payments are deposited with the United States Treasury's Crime Victims Fund. The Crime Victims Fund is distributed nationally to victims' organizations.

[10] Ms. Cowan's Declaration states that Ms. Kole's remaining criminal fine balance is $1,106.79. (Exhibit 2, Paragraph 9). The difference between Ms. Cowan's calculation and the Government's calculation is attributed to the Government's inclusion of the accrual of interest in its calculation.

defendants.  Finally, Section V of the Complaint, entitled "Relief" indicates that Ms. Kole seeks

relief from the Bureau of Prisons, only.  The Government has construed Ms. Kole's complaint

broadly, and is pleading on behalf of Kuma J. Deboo, Merry R. Wilner, Mark Staiger and the

Bureau of Prisons.

### B.   Statutory Basis for Claims

Ms. Kole's *pro se* complaint appears to be a generic, form complaint made available to

inmates and is entitled "Complaint Under the Civil Rights Act, Title 42 Section 1983 U.S.C.".

The Government anticipates however, that the Court may interpret Ms. Kole's complaint

liberally, and construe it as a claim for relief under any of three additional theories; namely

(1) the principles established in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of*

*Narcotics*, 403 U.S. 388 (1971); or (2) the remedies available under the Federal Tort Claims Act,

28 U.S.C. § 1346(b) (hereinafter "*FTCA*"); or (3) contract principles.

### C.   The Allegations

The Complaint at Section IV, entitled "Statement of Claim" contains allegations of

"threats and coercion" by Unit Manager Wilner and Counselor Staiger; a general allegation that

Warden Deboo "upheld the decision to take funds from my inmate account"; and at Section V,

entitled "Relief", allegations of breach of contract and undue hardship.  Ms. Kole requests: "I

want the Court to order the BOP to return to my account the $700.00 taken and to reinstate the

original contract I signed to be honored."

### V.   Relief under the Civil Rights Act, 42 U.S.C. § 1983

Relief under Section 1983 is available when an individual is deprived of a federal

constitutional right by a person acting under color of state law.  The Second Circuit has held that

a plaintiff "fails to state a claim under Section 1983 where the plaintiff does not sufficiently allege that the defendant acted under color of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002). An official has acted under color of state law for purposes of Section 1983 when that official "exercises a power 'possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law.'" *Colombo* at 118 (internal citations omitted).

Ms. Kole has filed what appears to be a generic complaint entitled "Complaint Under the Civil Rights Act, Title 42 Section 1983 U.S.C.". Excluding the reference to Section 1983 in the complaint's caption, Ms. Kole makes no other reference to Section 1983 in the body of the complaint. Moreover, Ms. Kole does not claim any violation of a federal constitutional right; nor does she claim that any of the defendants acted under color of state law. Moreover, there is no factual or legal authority to support a claim that Warden Deboo, Unit Manager Wilner and/or Counselor Staiger, working within the scope of their employment at a **federal** correctional institution somehow acted under color of state law.

Accordingly, Ms. Kole's complaint should be dismissed because of its failure to state a claim for relief under 42 U.S.C. § 1983.

Additionally, Congress enacted the Prison Litigation Reform Act of 1995, which imposes mandatory exhaustion of administrative remedies prior to the commencement of Section 1983 cases brought by prisoners. *See* 42 U.S.C. § 1997(e). Ms. Kole states at Section II.C of her complaint that she "exhausted all administrative remedies". Ms. Kole did in fact, seek general administrative relief at FCI Danbury (*see* "Factual Background" at pages 7-8, above), however this administrative process did not satisfy the requirements to pursue a tort claim. Significantly,

10

the regulations concerning the general administrative relief that Ms. Kole did pursue specifically refer her to the "statutorily mandated" administrative remedy procedures of 28 C.F.R. § 543 required for tort claims. *See* 28 C.F.R. § 542.10(c).

Ms. Kole failed however, to comply with the regulations relating to her administrative rights, as set forth at 28 C.F.R. § 543.30, et seq., and thus, for example, failed to file an administrative *tort* claim with the Bureau of Prisons Northeast Regional Office in Philadelphia, Pennsylvania. (*See* 28 C.F.R. § 543.31, referencing 28 C.F.R. § 503.2).

Thus, Ms. Kole failed to properly exhaust her administrative remedies prior to commencing this action, and therefore, her complaint must be dismissed on these grounds alone.

## VI.    Relief Under *Bivens* Principles

Although Ms. Kole's complaint fails to state a claim for relief pursuant to 42 U.S.C. § 1983, it may be construed as a *Bivens* action. "A *Bivens* action is a nonstatutory counterpart of a suit brought pursuant to 42 U.S.C. Section 1983, and is aimed at federal rather than state officials." *Mahoney v. National Organization for Women*, 681 F.Supp. 129, 132 (D.Conn. 1987).

*Bivens* actions seek to impose personal liability against a federal employee acting under color of their authority, for constitutional violations. "[A] *Bivens* action has two principal elements: first, a claimant must show he has been deprived of a right secured by the Constitution and the laws of the United States; second, he must show that in depriving him of that right the defendant acted under color of federal law." *Mahoney, id.*

Establishing the first *Bivens* element, i.e. the deprivation of a clearly established constitutional right, is an important hurdle in any *Bivens* analysis. The absence of any

11

deprivation of a constitutional right is a basis for dismissal of the entire case under both a Rule 12(b) inquiry, as well as a basis for a qualified immunity defense. Perhaps the only "right" that Ms. Kole has claimed is a "right" to **not** pay her criminal fine. In any event though, Ms. Kole has failed to allege the deprivation of any constitutional right, and thus she has failed to meet the first *Bivens* element.[11]

---

[11] Though Ms. Kole does not claim a deprivation of any constitutional right in her complaint, she did state in her Request for Administrative Remedy (Exhibit 4) that she did not have "notice" that funds from outside sources could be withdrawn from her commissary account. Although the Government's exhibit submitted in defense of this action should not be considered as a basis to construe the plaintiff's complaint, even if the Court were to construe Ms. Kole's complaint as containing a due process claim, it must still fail as a matter of law based upon the following reasons.

First, if the complaint is construed as a due process claim based on the alleged negligent acts of Unit Manager Wilner and Counselor Staiger, the claim must fail. "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

If, on the other hand, the complaint is construed as alleging that the IFRP itself is a denial of due process, that claim must also fail as a matter of law. Not every infringement of a program in a prison gives rise to a constitutional challenge of a denial of due process. *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). A liberty interest may arise either from the Due Process Clause of the Constitution itself, or it may arise from circumstances which impose atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 115 S.Ct. 2293 (1995). Prior to *Sandin*, a liberty interest in an inmate may arise either under the Due Process Clause of the Constitution itself or it may arise from statutes or regulations which set forth mandatory restrictions on decisions of prisons officials. *E.g.*, *Kentucky Department of Corrections v. Thompson*, 109 S.Ct. 1904, 1909 (1989); *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Hewitt v. Helms*, 459 U.S. 460 (1983); *James v. Quinlan*, 866 F.2d 627, 629 (3d Cir. 1989), cert. denied, 110 S.Ct. 197 (1989). A liberty interest in a job assignment does not arise under the federal Due Process Clause of the Constitution, nor under the federal statutes or regulations. *James v. Quinlan*, 866 F.2d at 629-630; *Garza v. Miller*, 688 F.2d 480 (7th Cir. 1982), cert. denied, 459 U.S. 1150 (1983). Plaintiff's claims regarding her work assignment, or any other loss of privileges, does not rise to the level of a constitutional liberty interest.

Furthermore, even if a liberty interest is found in any of the restricted privileges, such as a loss of Ms. Kole's job in UNICOR, the constitutional rights of an inmate may be infringed by a

It is important to note that even construing Ms. Kole's *pro se* complaint liberally, she must nevertheless meet some basic pleading requirements.   Federal courts of appeal have universally held that damages claims against government officials alleged to arise from constitutional violations cannot be founded upon conclusory, vague, or general allegations.  *See, e.g.* Ostrowski v. Mehltretter, 2001 WL 1220524, *2 (2d Cir. 2001)(in *Bivens* action, "conclusory allegations of the legal status of defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss")(internal citation omitted).

While the liberal requirements of notice pleading apply, plaintiffs must still plead facts with sufficient particularity to meet the elements necessary to lay a foundation for recovery against each named defendant: "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Bruns v. National Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997), citing, Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982). Such "[v]ague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id*.  *See also* Barr v. Abrams, 810 F.2d 358, 362-63 (2d Cir. 1987).

Since Ms. Kole has failed to allege a deprivation of any constitutional violation, even based on a liberal interpretation of her complaint as raising a *Bivens* claim, this action must nevertheless be dismissed based upon a failure to state a claim for relief.

---

prison regulation if the regulation is reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78 (1987).  The IFRP is reasonably related to the legitimate penological interest of inmate rehabilitation since it is designed to encourage inmates to develop a sense of financial responsibility. *Johnpoll v. Thornburgh*, 898 F.2d 849, 851 (2d Cir. 1990), cert. denied, 111 S.Ct. 63 (1990); *James v. Quinlan*, 866 F.2d at 630.  Thus, the IFRP would not violate such rights even if the rights are found to exist. *Id*.

## VII.    Qualified Immunity

Even assuming that Ms. Kole's complaint does in fact state a claim for relief based upon

a _Bivens_ theory of recovery, Warden Deboo, Unit Manager Wilner and Counselor Staiger are

nevertheless protected from suit based upon the protections of qualified immunity.

Qualified immunity shields government officials performing discretionary functions

"from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." _Harlow v._

_Fitzgerald_, 457 U.S. 800, 818 (1982).   It is applicable to suits for damages for alleged violations

of the Constitution or federal statutes that create an express or implied cause of action for

damages.  _Id._ at 807.  Qualified immunity may insulate a defendant's conduct[12] even if plaintiff's

rights were violated.  _McCullough v. Wyandanch Union Free School Dist._, 187 F.3d 272, 277 (2d

Cir. 1999)("the whole point of the qualified immunity defense is to allow a defendant to be

dismissed out of the case even if a right was actually violated . . . .").  The doctrine precludes an

award of damages for that violation so long as the official action did not cross a constitutional or

statutory bright line.  _Davis v. Scherer_, 468 U.S. 183, 190 (1984); _Mitchell v. Forsyth_, 472 U.S.

511, 526 (1985); _Anderson v. Creighton_, 483 U.S. 635, 640 (1987).

---

[12]    It is important to emphasize that a court's assessment of a qualified immunity defense
is wholly objective:  no inquiry into a defendant's subjective good faith is appropriate. _Mitchell
v. Forsythe_, 472 U.S. 511, 517 (1985)(_Harlow_ "purged the qualified immunity doctrine of its
subjective components"); _Davis v. Scherer_, 468 U.S. 183, 191 (1984) (the _Harlow_ Court
"rejected the inquiry into state of mind in favor of a wholly objective standard").  This is true
even when, as in the instant matter, the official's subjective intent is an essential part of plaintiff's
affirmative case.  _Crawford-El v. Britton_, 523 U.S. 574, 588 (1998) (qualified immunity "may
not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly
motivated," because [e]vidence concerning the defendant's subjective intent is simply irrelevant
to that defense").

In essence, qualified immunity gives public officials the benefit of legal doubt, so long as it was not clearly established at the time of their conduct that the Constitution precluded it. *Elder v. Holloway*, 510 U.S. 510, 515 (1994); *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (qualified immunity is "accommodation for reasonable error . . ."). It provides "ample room for mistaken judgments" and protects all government officials but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). Thus, officials are immune from claims for damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638. That is true even if the official's conduct violated other standards -- internal guidelines, ethical principles, regulations or statutes. *Davis*, 468 U.S. at 194 & n.12. The test, moreover, is whether "reasonable *official[s]*" could have thought the defendant's conduct permissible under the Constitution. *Wilson v. Layne*, 526 U.S. 603, 615 (1999)(emphasis added). The question is not whether judges or constitutional scholars could divine the outlines of the right plaintiff seeks to redress. *Id.* at 615.

Qualified immunity protects not only against liability, but from trial and even discovery. *Wyatt v. Cole*, 504 U.S. 158, 165-66 (1992); *Richardson v. McKnight*, 521 U.S. 399, 407-08 (1997). The Supreme Court has repeatedly emphasized that qualified immunity is immunity from suit. *Hunter*, 502 U.S. at 227 (Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation," so officers do not "err always on the side of caution because they fear being sued"); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) ("the privilege is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to

15

trial")(citations omitted, emphasis in original). Courts should firmly apply the federal procedural rules to ensure that officials are not subjected unnecessarily to burdensome discovery or trial proceedings. _Butz v. Economou_, 438 U.S. 478, 508 (1978)("plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits").

The Supreme Court has also established the "analytical structure" by which a claim of qualified immunity should be assessed. _Siegert v. Gilley_, 500 U.S. 226, 231-33 (1991). After observing that qualified immunity is an affirmative defense that a defendant must plead, the Supreme Court identified two issues raised by its assertion. _Id._ at 231. As the _Siegert_ Court reasoned, the question of whether a right was "clearly established at the time the defendant acted" necessarily includes a determination of "whether the plaintiff has asserted a violation of a constitutional right at all." _Id._ at 232. The Court noted that the question of whether a complaint states a claim for violation of any rights secured by the United States Constitution should be resolved at "an analytically earlier stage of the inquiry [into qualified immunity]." _Id._ at 227. The "[d]ecision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." _Id._ at 232. As a result, courts apply a two part test, asking whether plaintiff alleged a constitutional violation and, if so, whether it was a matter of clearly established law at the time of the actions in question.[13]

---

[13]    Once the Supreme Court clarified that the determination of clearly established law involved two distinct inquiries, and that a court should address the question of whether a constitutional violation was alleged first, some cases do not reach the second issue. _Compare_ _Conn v. Gabbert_, 526 U.S. 286, 293 (1999)(under the _Seigert_ framework, where the right

16

In June of 2001, in the context of an excessive force case, the Supreme Court reversed a Ninth Circuit ruling that deviated from the two-part analysis, indicating the importance of the prescribed structure. *Saucier*, 533 U.S. 194 (2001).  In *Saucier*, the Supreme Court described its prior construction of the analytic framework as an "insist[ence] upon turning to the existence or nonexistence of a constitutional right as the first inquiry."  *Id*. at 201.  The Court noted its "*instruction* to the district courts and courts of appeal to concentrate at the outset on the definition of the constitutional right and to determine whether, on the facts alleged [in the light most favorable to the party asserting the injury], a constitutional violation could be found . . .."  *Id*. at 207 (emphasis added). In addition, when concentrating on this task, a court is permitted to define the constitutional right with some specificity. *Id.*  "[I]f a violation could be made out on a favorable view of the parties' submissions, the *next, sequential step* is to ask whether the right was clearly established." *Id*. at 201 (emphasis added).  As the *Saucier* Court described, the second step is whether an officer's mistake as to the "legality" of his acts was reasonable.  *Id.* at 205-06.  Moreover, the 'clearly established law' inquiry, "it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. The two-step inquiry is necessary regardless of the particular right asserted, and even if there is overlap between the inquiry into whether a constitutional right exists and whether it was clearly

---

asserted was not infringed by the defendant's conduct, addressing "the question of whether such a right was 'clearly established' as of a given day" was unnecessary) *with Wilson*, 526 U.S. at 614 (Supreme Court addressed whether the Fourth Amendment prevented law enforcement officials from inviting the media on "ride alongs," entering people's homes when executing search and arrest warrants; only after concluding that the actions were barred by the Constitution did the Court turn to the question of whether that violation was "clearly established" at the time of the entry in the case, concluding that it was not).

established.[14]  *Id*. at 206 (rejecting argument that the qualified immunity analysis applies

differently in excessive force cases than in other constitutional circumstances).

 According to the Second Circuit, "[t]he doctrine of qualified immunity provides

immunity to government officials sued in their individual capacity in any of three situations: (1)

if the conduct at issue is not prohibited by federal law; (2) even if the conduct was prohibited, if

the plaintiff's right was not clearly established at the time of the conduct; or (3) if the defendant's

conduct was objectively legally reasonable in light of clearly established law." *Anobile v.*

*Pelligrino*, 274 F.3d 45, 62-63 (2d Cir. 2001)(citation omitted)(finding that although defendant

violated the Fourth Amendment, qualified immunity precluded suit because the issue of whether

dormitories located on the premises of a highly regulated business are entitled to the same Fourth

Amendment protections afforded to private residences was not clearly established); *In Re State*

*Police Litigation*, 88 F.3d 111, 123 (2d Cir. 1996)(even if law is "clearly established," defendant

may be entitled to qualified immunity if "reasonable persons in their position would not have

understood that their conduct was within the scope of the established prohibition").  "The

objective reasonableness" of defendants' acts "depends in part on what information they had at

the time." *Brown v. City of Oneonta, N.Y., Police Dept.*, 106 F.3d 1125, 1132 (2d Cir. 1997).

 In the Second Circuit, a right is "clearly established" when its particular elements have

been defined by case law.  "[I]n ascertaining whether the right was clearly established with

respect to a given situation, a court must consider not what a lawyer would learn or intuit from

---

 [14]  The *Saucier* Court also made clear that inquiry into whether an official is entitled to qualified immunity for the use of excessive force is distinct from inquiry into the merits of a plaintiff's excessive force claim. 533 U.S. at 204.

researching case law, but what a reasonable person in the government actor's position should know" about the appropriateness of his conduct under federal law. *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 251 (2d Cir. 2001)(citing *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).  "Notwithstanding . . . earlier indications of the law's likely evolution," in the absence of a specific determination of a right and its contours, qualified immunity is appropriate because  a "reasonable police officer cannot be expected to anticipate developments in the law." *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001).

Although "determining whether a right is 'clearly established' is not subject to mathematical precision," *Johnson*, 239 F.3d at 250, a plaintiff seeking to defeat qualified immunity cannot rely on generalized constitutional doctrine such as "free speech," "prior restraint," or constitutional "chill." *Lewis v. Cowen*, 165 F.3d 154, 167 (2d Cir. 1999), *cert. denied*, 528 U.S. 823 (1999)(district court's definition of First Amendment right for qualified immunity purposes as "the freedom of speech" was overbroad; inquiry should have been "whether the defendants should have known that terminating a policymaking public employee for refusing to promote agency policy as directed by his employer would violate the First Amendment"). Where "officers of reasonable competence could disagree" as to the legality of the defendant's actions, qualified immunity should bar suit. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995); *see also Danahy v. Buscaglia*, 134 F.3d 1185, 1191-92 (2d Cir. 1998).

As a general rule, the Second Circuit requires that a right be affirmatively established in Second Circuit or Supreme Court decisions. *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999), *cert. denied*, 528 U.S. 964 (1999) (issue for qualified immunity purposes is "whether the Supreme Court or the Second Circuit had affirmed the existence of the right"); *Anobile*, 274

19

F.3d at 63 (where no decision of the Second Circuit had "addressed, even generally, the permissibility of searching residential rooms on the grounds of a highly regulated commercial enterprise [Yonkers' Raceway]," defendants are entitled to qualified immunity); _Nicholas v. Miller_, 189 F.3d 191, 195 (2d Cir. 1999)("Without Second Circuit or Supreme Court authority defining with reasonable specificity Nicholas's right to form an inmate legal services organization, appellees are entitled to qualified immunity"); _Young v. County of Fulton_, 160 F.3d 899, 903 (2d Cir. 1998) (asking "[h]ad the Supreme Court or the Second Circuit affirmed the rule?"); _Richardson v. Selsky_, 5 F.3d 616, 623-24 (2d Cir. 1993) (putting significant weight on whether the law was governed by controlling precedent of the Second Circuit).

With these legal principles in place, Warden Deboo, Unit Manager Wilner and Counselor Staiger are entitled to the protections of qualified immunity since all three of the requirements articulated in _Anobile v. Pelligrino_, _supra_ are present in this case. Specifically, a review of the complaint shows that it does not contain a claim that any of the alleged conduct was prohibited by federal law.

Second, even if any of the alleged conduct was prohibited, Ms. Kole had no "clearly established" right concerning the IFRP. On the contrary, the IFRP is related to a legitimate penological interest, such that it encourages inmates to rehabilitate themselves by developing a sense of financial responsibility. _See_ prior discussion at footnote 11, above.

Finally, the third part of the qualified immunity test set forth in _Anobile v. Pelligrino_, _supra_, is whether the alleged conduct of Warden Deboo, Unit Manager Wilner and Counselor Staiger was "objectively legally reasonable in light of clearly established law." A review of

20

Warden Deboo's denial (Exhibit 5) of Ms. Kole's Request for Administrative Relief is self-evident of a well reasoned and objectively reasonable decision.

Similarly, the underlying recommendations of Unit Manager Wilner and Counselor Staiger suggesting that Ms. Kole contribute $700.00, as opposed to any other amount up to $2,282.81 (the total deposits made to her commissary account during a six month period), was similarly based on the sound principles of the IFRP, and was also objectively reasonable.

Thus, the actions of Warden Deboo, Unit Manager Wilner and Counselor Staiger were all protected by the doctrine of qualified immunity, and are therefore immune from suit. Therefore, even to the extent that Ms. Kole's complaint is construed as raising a _Bivens_ cause of action, it must nevertheless be dismissed because of lack of subject matter jurisdiction.

### VIII.    Relief Under the Federal Tort Claims Act

#### A.  Suit Against the United States

The _FTCA_ provides a waiver of sovereign immunity by the United States for the negligent actions of federal employees who are acting within the scope of their employment. _See_ 28 U.S.C. § 1346(b)(1). The _Westfall Act_ amended the _FTCA_ by extending immunity to shield federal employees acting within the scope of their employment from personal liability for state law claims. _See_ 28 U.S.C. § 2679(b)(1) and (d). Thus, it is well-settled that suits against federal employees acting in their official capacities are in essence suits against the United States. _See_ _FDIC v. Meyer_, 510 U.S. 471, 484-86 (1994); _Kentucky v. Graham_, 473 U.S. 159, 166-67 (1985); _Robinson v. Overseas Military Sales Corp.,_ 21 F.3d 502, 510 (2d Cir. 1994).

The *FTCA* is the exclusive remedy for suits that allege that federal employees violated state laws while acting within the scope of their employment. The employee is shielded from personal liability by substitution[15] of the United States as the named defendant.

Ms. Kole's complaint may most likely be construed as a *FTCA* cause of action, based upon Warden Deboo, Unit Manager Wilner and Counselor Staiger acting in their official capacities as BOP employees. Assuming that Ms. Kole's complaint is so construed, and also assuming that the United States' pending Motion for Substitution is granted; what will remain is a suit against the United States. Ms. Kole is not entitled however, to relief against the United States pursuant to the *FTCA* because (1) she failed to exhaust appropriate administrative remedies; and (2) this Court lacks subject matter jurisdiction pursuant to *FTCA* exceptions.

### B.  Failure to Exhaust Administrative Remedies

The *FTCA* requires exhaustion of administrative remedies before the filing of suit. Specifically, 28 U.S.C. § 2675(a) provides, in pertinent part, that "[a]n action shall not be instituted [under the *FTCA*] . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency."

---

[15]     Filed simultaneously herewith is the Government's Notice of Substitution, effecting substitution of the United States of America as the defendant, in lieu of Kuma J. Deboo, Merry R. Wilner, Mark Staiger individually, as to the plaintiff's state law claims, if any.

Substitution is effected when the Attorney General, or his designee, certifies that a defendant was acting within the scope of his or her employment at all times relevant to a suit. Here, the Attorney General's designee, United States Attorney Kevin J. O'Connor, District of Connecticut, has certified that Warden Deboo, Unit Manager Wilner and Counselor Staiger were acting within the scope of their employment at all times relevant to this suit. Thus, by operation of law, Warden Deboo, Unit Manager Wilner and Counselor Staiger should be dismissed as to any state law claims asserted by Ms. Kole, or construed to be asserted by the Court; and the United States is substituted as the sole defendant as to Ms. Kole's state law claims.

Presentment of an administrative claim and exhaustion of that remedy are jurisdictional and cannot be waived. _McNeil v. United States_, 508 U.S. 106, 111-13 (1993); _Filaski v. United States_, 776 F.Supp. 115, 117 (E.D.N.Y. 1991). Thus, a plaintiff's failure to comply with § 2675(a) mandates dismissal of all causes of action cognizable under § 1346(b) of the _FTCA_. _Contemporary Mission, Inc. v. United States Postal Serv._, 648 F.2d 97, 104 (2d Cir. 1981); _Rauccio v. Frank_, 750 F.Supp. 566, 574 (D.Conn. 1990)(Eginton, J.).

As argued above, Ms. Kole stated at Section II.C of her complaint that she "exhausted all administrative remedies". Ms. Kole's statement is erroneous because she simply sought general administrative relief at FCI Danbury (_see_ "Factual Background" at pages 7-8, above). The general administrative process Ms. Kole pursued did not satisfy her requirements under the _FTCA_. Pursuant to 28 C.F.R. § 543.30, et seq., and particularly 28 C.F.R. § 543.31, Ms. Kole was required to file a _FTCA_ administrative claim with the Bureau of Prisons Northeast Regional Office in Philadelphia, Pennsylvania. (28 C.F.R. § 503.2).

Ms. Kole failed to comply with 28 C.F.R. § 543.31, and therefore, her complaint must be dismissed for failure to properly exhaust her administrative remedies.

### C. No Subject Matter Jurisdiction Exists Pursuant to 28 U.S.C. § 2680(h)

If Ms. Kole's complaint is construed as being based on contract principles[16], then it must be dismissed pursuant to 28 U.S.C. § 2680(h).

---

[16] Ms. Kole alleges that she was threatened and coerced into executing the amended Inmate Financial Contract on September 10, 2002. Complaint, Section IV, entitled "Statement of Claim". Ms. Kole further alleges that "When the BOP violated their contract it created an undue hardship on me." Complaint, Section V, entitled 'Relief'.

The *FTCA* provides at 28 U.S.C. § 2680(h) that the remedies under the *FTCA* are unavailable for "any claim arising out of . . . interference with contract rights . . .".  Thus, if the complaint is construed as sounding in contract, it cannot be maintained as an action under the *FTCA* since, pursuant to 28 U.S.C. § 2680(h), relief under the *FTCA* is predicated on tort causes of action, not contract.  *Birnbaum v. United States*,588 F.2d 319, 322 (2d Cir. 1978).

Moreover, even if Ms. Kole's complaint is construed as alleging tortious interference with her contract rights, it will nevertheless remain barred by 28 U.S.C. § 2680(h). *Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 105, n.9 (2d Cir. 1981).

### IX.   No Relief Available Based on Principles of Contract

#### A.   Introduction

The complaint in this action includes some classic contract related "buzz words" of "threat and coercion"; "I willingly signed a contract"; and the "BOP violated their contract".

Despite a confusion of claims sounding in both contract and tort, in cases such as this one, courts will look to the relief sought in order to determine which principles to apply.

In *Polanco v. DEA*, 158 F.3d 647 (2d Cir. 1998), Mr. Polanco sought the return of money held by the DEA.  The Second Circuit held that "[a]lthough Polanco ultimately seeks to possess himself of a sum of money, the remedy he seeks is to correct a procedural deficiency by vacating the administrative forfeiture . . .  This relief is equitable in nature, notwithstanding the fact that the property at issue is currency." *Id.* at 652, citing *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  *See* also *United States v. King*, 395 U.S. 1, 3 (1969)(no relief under the Tucker Act for claims that seek equitable remedy).

24

Here, Ms. Kole states in her complaint at Section V, entitled "Relief" that "All I want the Court to order the BOP to return to my account the $700.00 taken and to reinstate the original contract I signed to be honored."[17]  Similar to the relief sought by Mr. Polanco, Ms. Kole also seeks relief for what she perceives to be procedural deficiencies in the IFRP at FCI Danbury, *i.e.* failure to withdraw funds from April 9, 1998 until March 14, 2002; and failure to withdraw a portion of UNICOR wages only, as opposed to funds from "outside sources" also deposited into her commissary account.  Thus, the equitable relief that Ms. Kole seeks defines her claim as sounding in tort, not contract

Moreover, in <u>Brown v. United States</u>, 36 Fed.Cl. 290 (1996), a taxpayer sought relief based upon contract theories for alleged unlawful pressure tactics used by the Internal Revenue Service to collect unpaid taxes.  The pressure tactics included the levying of a bank account.  The Federal Court of Claims held that the allegations against IRS personnel were claims sounding in tort.

Apparently, Ms. Kole also considers as "pressure tactics" the authority of the BOP to use institutional incentives (pursuant to 28 C.F.R. § 545.11(d)(1) through (11)); and the Government's general authority to satisfy criminal obligations from "any property" belonging to a debtor (<u>see</u> 18 U.S.C. § 3613(a)) as "threats and coercion".  These allegations, though baseless, nevertheless sound in tort, not contract.

---

[17] Ms. Kole's request for reinstatement of her February 1, 1998 authorization for withdrawals of fifty percent her wages from her commissary account is a moot request since her October 25, 2002 authorization (Declaration of Deborah Cowan, Exhibit 2-E), which again authorized fifty percent contributions, is currently in effect.

In any event, even if Ms. Kole's allegations could somehow be construed as a contract cause of action against the United States, her complaint should still be dismissed as a matter of law, based upon the following reasons.

Contract claims seeking recovery from the United States are typically based on the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613, or the Tucker Act, 28 U.S.C. § 1491(A)(1), which amended the Contract Disputes Act.  Significantly, under the Contract Disputes Act, district courts "shall **not** have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to [41 U.S.C. §§ 607(g)(1) and 609(a)(1)] of the [CDA]."  _See_ 28 U.S.C. § 1346(a)(2).  Thus, this Court lacks subject matter jurisdiction to consider any relief that could be afforded Ms. Kole under the Contract Disputes Act.

The remaining avenue for relief based upon a contract theory potentially rests with the Tucker Act, 28 U.S.C. § 1491(a)(1), which provides a waiver sovereign immunity so that the United States Court of Federal Claims can entertain money claims against the United States.  The so-called Little Tucker Act, 28 U.S.C. § 1346(a)(2), affords parties the same relief in United States District Court when the amount in controversy is under $10,000.00.

In _Presidential Gardens Associates v. HUD_, 175 F.3d 132, 141 (2d Cir. 1999), citing _Massie v. United States_, 166 F.3d 1184, 1188 (Fed.Cir.1999), the Court reasoned that any agreement can be considered a contract within the meaning of the Tucker Act, "provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had

26

actual authority to bind the Government." Based on the criteria set forth in *Presidential Gardens*, none of Ms. Kole's IFRP authorizations can be considered a contract within the meaning of the Tucker Act since each lacks all the indicia of a binding contract.

In particular, there can be no offer and acceptance, or consideration, since the IFRP is purely voluntary, and the granting of institutional incentives is purely discretionary. Additionally, the BOP employees who witnessed Ms. Kole's signature would have had no actual authority to bind the Government to what Ms. Kole claims (*i.e.* no withdrawals of funds from outside sources) . Moreover, even if BOP employees did agree that only UNICOR wages were subject to contribution, or that Ms. Kole should not make any contribution through the IFRP (despite the fact that Ms. Kole benefitted for years from IFRP incentives), such an agreement would be contrary to law. Specifically, 18 U.S.C. § 3613(a) and the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, et seq., provide the Government extensive collection remedies regardless of whether a criminal debtor enrolls in the IFRP or not. If Ms. Kole were correct (which she is not), that the IFRP does not allow contributions from "outside sources", or prohibits the levying of "any property", then the IFRP would be at odds with the Government's statutory right to collect criminal debts.

Finally, Tucker Act claims generally must involve an appropriated fund activity. *United States v. Hopkins*, 427 U.S. 123 (1976). *See* also *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001)(discussing the "non-appropriated fund doctrine"). In the instant case, Ms. Kole seeks the return of funds (from the BOP), which the BOP has already deposited with the Crime Victims Fund. Pursuant to the non-appropriated fund doctrine, this Court will lack jurisdiction unless there is a showing that Congress has specifically authorized the BOP to

reimburse inmates for funds deposited in the Treasury's Crime Victims Fund from BOP's appropriated funds. There is not such authority upon which Ms. Kole can rely.

Based upon all of the foregoing reasons, and to the extent that Ms. Kole's claims are construed as claims based upon contract principles, her claims must be dismissed as a matter of law.

## X.  Improper Service

It is well-settled that personal service is required when suing a federal employee in his individual capacity.  *See Armstrong v. Sears*, 33 F.3d 182, 186 (2d Cir. 1994)("It is clear that the individual defendants must be served in a *Bivens* case in accordance with [Fed.R.Civ.P.] 4(e)"). Unit Manager Wilner and Counselor Staiger have not been properly served in accordance with Fed. R. Civ.P. 4(e), and thus the plaintiff's complaint should be dismissed as to Unit Manager Wilner and Counselor Staiger, pursuant to Fed.R.Civ.P. 12(b)(5) and Fed.R.Civ.P. 4(m).

## XI.  Conclusion

Based upon all of the reasons previously articulated, the Department of Justice respectfully submits that Ms. Kole's complaint should be dismissed and, accordingly requests that its motion to dismiss be granted.

Respectfully submitted,

Kevin J. O'Connor
United States Attorney


Christine Sciarrino
Assistant United States Attorney
United States Attorney's Office
P.O. Box 1824
New Haven, CT   06510
(203) 821-3700
Federal No. CT03393

<u>Certification</u>

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 19th

day of February, 2004, to:

Agnes Kole
Inmate # 18423-050
FCI
Pembroke Station
Danbury, Connecticut   06811

_____
Christine Sciarrino